[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14595

_____

D.C. Docket No. 0:14-cv-01188-RWS

MYRA FURCRON,

Plaintiff–Appellant,

versus

MAIL CENTERS PLUS, LLC,

Defendant–Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 16, 2016)

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and SCHLESINGER,[*] District Judge.

SCHLESINGER, District Judge:

Myra Furcron ("Furcron") appeals an adverse summary judgment granted in favor of Mails Centers Plus, LLC ("MCP") on Furcron's claims of sexual harassment and retaliation.  In addressing Furcron's sexual harassment claim, the district court found that Furcron failed to produce sufficient evidence that the alleged harassment was based on sex.  On the retaliation claim, the district court found that Furcron failed to demonstrate that she engaged in protected activity and that Defendant's defense was a pretext for her termination.  We vacate and remand in part, and affirm in part.

## I. BACKGROUND

### A. Facts[1]

MCP is a business services provider specializing in a broad range of facilities and administrative support activities for mid-sized and large corporations. One of MCP's largest clients is the Coca-Cola Company—the site of the workplace where the majority of the events surrounding the facts of this case

---

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

[1] This Court's use of the word "facts" is solely for purposes of reviewing the district court's rulings on the proceedings below and not necessarily the actual facts. *Kelly v. Curtis*, 21 F.3d 1544, 1546 (11th Cir. 1994).

occurred.  Furcron was hired by MCP in 2008 to work as a mailroom clerk.  In 2010, she was transferred to Coke Receiving (the "KOR")—located on Coca-Cola's property in Atlanta, Georgia—where employees are responsible for receiving and sorting inbound mail and small packages throughout that work site.  Daniel Seligman is the co-worker at KOR that Furcron alleges harassed her.  Seligman was hired in 2011, also as a mailroom clerk.  On November 27, 2012, for reasons that are disputed, Seligman was transferred to Furcron's work area.  The events taking place between the day of Seligman's transfer to the KOR and the day of Furcron's termination, December 7, 2013, are the subject of the present dispute.

Seligman suffers from Asperger's syndrome, and the complications associated with the disorder have led to some difficulties for him in the workplace.  Seligman often exhibits mannerisms that are generally considered awkward and inappropriate, including staring, brushing up against employees, and talking in people's faces.  For instance, before his transfer to the KOR, an employee observed Seligman undressing in a workplace restroom.  On another occasion, Seligman and another employee were discussing movies when Seligman, upon walking past a credit union, hypothesized about a movie scene where someone robbed a credit union.  In a third incident, Seligman was observed in the workplace lobby acting strangely when another employee thought she overheard him say the

3

word "kill." According to MCP, these incidents were all investigated, and no disciplinary action was necessary.

Perhaps the most significant incident concerns the circumstances of Seligman's transfer from Coca-Cola's mailroom to KOR. According to Furcron, MCP transferred Seligman to KOR after Seligman began to visit a female assistant in her office on a daily basis, distracting the assistant from her job. Furcron states that, in May of 2012, Seligman was counseled by Roger Maloney, co-manager of the KOR and Furcron's supervisor, to stay away from the assistant's work area. Later that year, in November, Seligman was again counseled by another supervisor that his actions towards the assistant were inappropriate. A short time after the second counseling, the assistant complained, which seems to have precipitated Seligman's transfer. The assistant's complaint, in Furcron's words, concerned Seligman's frequent visits to the assistant's work area, and her apprehension that it might be perceived as interfering with her job. Allegedly, Seligman would later tell Furcron that he was transferred for "stalking women in the parking lot."

MCP disputes the reasons for Seligman's transfer. While acknowledging Seligman had been counseled previously for his behavior, according to Ronald Davie (MCP's director of human resources), the assistant's complaint was out of concern for Seligman's well-being. As Seligman did not understand when to stop engaging individuals, the decision to transfer Seligman, Davie suggests, was to

4

limit Seligman's "downtime."  In any case, Seligman was transferred and began working in the KOR on November 27, 2012.

Furcron initially attempted to befriend Seligman, in order to ease his adjustment to the KOR.  She believes Seligman mistook her friendly demeanor for flirtation.  During their six days working together, Furcron said Seligman frequently entered her work area and invaded her personal space.  At other times, she said Seligman stared at her from afar.  He also allegedly attempted to look down Furcron's shirt and at her underwear when she bent over.  Another female employee, Tameka Johnson, who worked with Seligman during the same period as Furcron, gave testimony that Seligman would look at Johnson's breasts and her buttocks when she bent over.

Furcron observed that Seligman frequently ("on a daily basis") exhibited an erect penis while staring at her.  More significantly, she said Seligman would deliberately bump and rub his erection against her.  A co-worker, Sam Fortson, witnessed Seligman's state of arousal around Furcron, as well as the intentional bumping and rubbing.  Fortson also observed Furcron crying because she had to work with Seligman.

Furcron did not initially complain to her managers, even though Seligman's actions made her uncomfortable and diminished her job performance, because she recognized Seligman's condition may have affected his behavior.  However,

5

Furcron did make her concerns known to Seligman, and Seligman appeared to understand.    Nevertheless, the behavior continued, and ultimately Furcron complained to her supervisor, Maloney, about Seligman.  She told Maloney she felt uncomfortable working around Seligman because he stared at her, invaded her personal space, and bumped and rubbed against her with an erection.  Maloney's alleged response was that Seligman meant no harm, and that his conduct should be tolerated because of his disability.  Furcron complained to Maloney on subsequent occasions, but Maloney refused to take action, claiming Seligman "had friends in high places at Coca-Cola, and it was out of his hands."

On November 30, 2012—three days after Seligman's transfer—Furcron took a picture of Seligman from the neck down, to prove to Maloney that Seligman "exhibited an erection in the workplace."  Furcron explained that she did not take the photo to embarrass Seligman, but only to support her claim of sexual harassment.  Furcron also showed the photograph to several co-workers, but when she did so is disputed.  MCP claims that the photograph was shown to at least three non-management employees prior to Furcron approaching management.  Furcron admits that she approached several female co-workers with the photograph, but only after showing the photograph to Maloney and receiving no response, and only to "make management take her complaints seriously."

6

Whatever the case, Furcron complained to Maloney about Seligman on December 3, 2012—according to MCP, for the first time. She says Maloney was dismissive, and laughed in response to being shown the photograph of Seligman's erection. She then requested to file a formal complaint with Human Resources ("HR"), and Maloney agreed to contact and report the complaint to HR on her behalf. According to MCP, immediately after this meeting, Maloney attempted to contact Davie (who was unavailable) but did contact Michael Wright, Senior Manager of Operations, to report the photograph and Furcron's statement that that Seligman had an erection. Maloney's notice prompted an immediate investigation, but Furcron claims that she never received a response from HR after her complaint to Maloney.

The next day Furcron met with Wright, and later that day, with Vandrena Armstrong (also a manager), to discuss the photo and her concerns. Both managers allegedly reacted with laughter, and Armstrong responded that Seligman "was always like that."

The following day, December 5, 2012, Furcron sent an email to HR and two other MCP managers. In her short email, Furcron explained that she feared for her safety and needed to speak with someone as soon as possible. The majority of the email references the incidents prior to Seligman's transfer to the KOR. Furcron was clear that Seligman had a constant erection which caused her to be "very

7

uncomfortable." Shortly after Furcron sent the email, Maloney told her not to show the photograph to anyone.

The same day Furcron met with Wright and Davie. Furcron said the purpose of the meeting was to discuss "her trying to show a picture of Seligman to Wright." Furcron repeated her concerns with Seligman to both managers, but neither had much interest in what Furcron had to say. Instead, they were interested in the photograph of Seligman. In Furcron's deposition, however, she testified that she did not say anything at all about Seligman during the meeting; she also stated, however, that (after turning over the photograph) she tried to speak to Wright and Davie, but was not allowed to.

At the conclusion of the meeting, Furcron was suspended. Furcron says she was suspended to allow MCP to conduct an investigation, and was told that she could not to return to work until MCP contacted her. According to MCP, Furcron was suspended because she took an inappropriate photograph and admitted to showing it around the workplace, and because Furcron planned to show the photograph to other employees, in spite of her managers' instructions not to. MCP claims that Furcron was instructed, at the December 5th meeting, not to discuss her complaint or other confidential information while the investigation was pending. Furcron claims no such instructions were ever given.

On December 7, 2012, Furcron's employment was terminated. Wright and Davie informed her the decision was based on Furcron's taking the photograph of Seligman. The reason for termination listed on Furcron's Separation Notice is: "Taking sexually suggestive pictures of a male associate's private are without his permission or knowledge. Stored them in her camera and displayed the picture to other associates . . . ." Furcron suggests that she was terminated for reporting sexual harassment.

MCP gives an additional reason for the termination in Furcron's Disciplinary Form, which was not included in the Separation Notice. On December 6, 2012, an HR Representative from Coca-Cola contacted them to advise that Furcron had made numerous allegations against MCP—namely, that MCP had placed employees of both companies in danger by not following security policies and procedures in the workplace. Apparently, Furcron also discussed Seligman's photograph with Coke's HR Representative, and she was concerned that Furcron was showing pictures of an employee's crotch in the workplace.

As stated before, according to MCP, Furcron's violation of the company's previous instructions not to discuss the pending investigation, and upon concluding that Furcron did take and display a photograph of Seligman to co-workers in violation of its policies, MCP felt it had no option but to terminate Furcron. Furcron insists that she violated no rules or directives. She states that MCP never

9

instructed her to refrain from showing the photograph to others at the December 5th meeting and that she complied with those instructions.  Further, she states, MCP did not ask her to refrain from discussing the investigation while it was pending.  Furcron also admits to contacting Coca Cola, but insists she did not do so until after her termination.

Four days after she was terminated, on December 11, 2012, Furcron filed a Charge of Discrimination with the Equal Employment Opportunity Commission. She was issued a Notice of Right to Sue around December 10, 2013.

## B.  Procedural History

Furcron filed her initial Complaint in the Superior Court of DeKalb County in the State of Georgia on March 7, 2014, alleging sexual harassment and retaliation under Title VII, 42 U.S.C. § 2000e.  MCP removed the case to the United States District Court for the Northern District of Georgia on April 22, 2014. After the close of discovery, MCP filed a Motion for Summary Judgment as to both counts of Furcron's Complaint, which was subsequently submitted to the Magistrate Judge for a Report and Recommendation.  MCP also filed a Motion to Exclude the Declarations[2] of Furcron and witness Tameka Johnson—this motion was also submitted to the Magistrate Judge.

---

[2] The Court clarifies that although "[t]he terms 'declaration' and 'affidavit' are used interchangeably in common parlance and in case law, . . . [a]n affidavit is made under oath; a declaration is not sworn, but is subject to the penalty of perjury." *Soutter v. Equifax Info. Servs.*

On the Motion to Exclude, the Magistrate Judge ruled that portions of Furcron's Declaration contradicted her prior deposition testimony, and excluded those portions on that basis.  The Magistrate Judge excluded Johnson's Declaration as immaterial.  The Report and Recommendation recommended granting summary judgment to MCP on both of Furcron's counts.  On the sexual harassment claim, the Magistrate Judge found that Furcron failed to submit sufficient evidence that the harassment was severe or pervasive, or that it was based on Furcron's sex.  As for the retaliation claim, the Magistrate Judge found that Furcron did not engage in protected speech; he also concluded that Furcron failed to demonstrate a pretext for her suspension and termination.    Furcron objected to the Report and Recommendation as well as the evidentiary rulings, and requested the district court review these findings.

Without articulating a standard of review, the district court adopted the Report and Recommendation's conclusions, but rejected the Magistrate Judge's finding on the severity and pervasiveness of the harassment.  Summary Judgment was entered in favor of MCP.  Furcron timely filed the instant appeal.

---

*LLC*, 299 F.R.D. 126, 128 n.4 (E.D. Va. 2014).  The statements submitted by Furcron were not made under oath, but included language subjecting the declarants to the penalty of perjury. Thus, the sworn statements are properly termed "declarations," rather than "affidavits." Nevertheless, declarations are afforded the same legal weight as affidavits, and are treated accordingly.  *See* 28 U.S.C. § 1746.

## II.  STANDARDS OF REVIEW

We review a district court's grant of summary judgment *de novo*.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291 (11th Cir. 2012).  Our review is guided by our previous admonition that "[s]ummary judgment is such a lethal weapon, depriving a litigant of a trial on the issue, caution must be used to ensure only those cases devoid of any need for factual determinations are disposed of by summary judgment."  *Tippens v. Celotex Corp.*, 805 F.2d 949, 952–53 (11th Cir. 1986).

A grant of summary judgment will be affirmed if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact."  *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The Federal Rules of Civil Procedure require "the court . . . examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party."  *Hillburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1225 (11th Cir. 1999) (citing Fed. R. Civ. P. 56(c)).  Put

differently, we must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Findwhat*, 658 F.3d at 1307. Thus, the Court "may not weigh conflicting evidence or make credibility determinations of its own." *Id*.

We review the district court's rulings on the admission of evidence for abuse of discretion. *Goulah v. Ford Motor Co.*, 118 F.3d 1478, 1483 (11th Cir. 1997). A district court abuses its discretion where its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *United States v. Westry*, 524 F.3d 1198, 1214 (11th Cir. 2008) (quoting *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006)) (internal quotation marks omitted). The district court's evidentiary rulings will be affirmed "unless the district court has made a clear error of judgment or has applied an incorrect legal standard." *Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1232 (11th Cir. 2004) (internal quotation marks omitted) (citing *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1306 (11th Cir. 1999)).

However, even a clearly erroneous evidentiary ruling will be affirmed if harmless. *See Perry v. State Farm Fire & Cas. Co.*, 734 F.2d 1441, 1446 (11th Cir. 1984). An error is harmless unless it affects the substantial rights of the parties. *Id.* (citing Fed. R. Evid. 103; Fed. R. Civ. P. 61); *see also Guolah*, 118 F.3d at 1483 (stating "[this court] will not overturn an evidentiary ruling unless the

moving party proves a substantial prejudicial effect."). Substantial rights are affected "if one cannot say, with fair assurance . . . that the judgment was not substantially swayed by the error." *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1159–60 (11th Cir. 1986) (quoting *Kotteakos v. United States.*, 328 U.S. 750, 764–65 (1946)).

## III.  DISCUSSION

### A. <u>The Sexual Harassment Claim</u>

Furcron argues that the district court committed reversible error in excluding portions of Furcron's Declaration and the entire Declaration of Tameka Johnson. She further argues the district court erred in granting MCP summary judgment on Furcron's sexual harassment claim. For the reasons set forth below, we conclude the exclusion of Johnson's Declaration was an abuse of discretion. Because resolution of this issue is sufficient to dispose of the claim on appeal, we limit our inquiry to addressing only the district court's evidentiary ruling.

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment that takes the form of a hostile work environment is actionable under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

To establish a prima facie case for a hostile work environment based on sexual harassment, an employee must demonstrate the following essential elements: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of the employment; and (5) there is a basis for holding the employer liable for the harassment. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The Magistrate Judge's Report and Recommendation focused on elements three and four, concluding that Furcron could not demonstrate a genuine issue of material fact as to either. Critical to the Magistrate Judge's recommendation, however, was his contemporaneous evidentiary ruling, which excluded two Declarations filed by Furcron in opposition to MCP's motion. The first Declaration was Furcron's, to which the Magistrate Judge applied the "sham affidavit" rule, and excluded "to the extent that [Furcron's] testimony in her Declaration contradicts her prior sworn deposition testimony . . . ." The second Declaration was from Tameka Johnson, a co-worker. The Magistrate Judge excluded Johnson's Declaration as "largely immaterial," without any further explanation.

In its review of the Report and Recommendation, the district court

15

determined that, as to the "severe or pervasive" element, the Magistrate Judge did not sufficiently construe the facts in favor of Furcron and rejected that portion of the recommendation. However, the district court adopted the recommendation as to the "based on sex" element, stating: "The evidence in the record shows that Seligman's constant erection did not relate to [Furcron's] sex or gender. [Furcron] has not offered any evidence to show that Seligman singled her our because of her sex, and accordingly, her Title VII sexual harassment claim must fail." On that basis, the district court granted summary judgment in favor of MCP. It did so, however, without identifying which part of the Magistrate Judge's evidentiary ruling it was adopting. As a consequence, we are unable to determine what consideration the district court gave the Declarations, if any, in its decision to grant summary judgment on the sexual harassment claim.[3]

### 1. *Summary Judgment is Improper if Furcron's Declaration is Not Excluded*

Although the district court concluded that Furcron could establish a genuine dispute of material fact as to the "severity and pervasiveness" of Seligman's alleged harassment, it ultimately held that she failed to proffer any evidence to establish that the harassment was "based on sex."

Title VII is implicated where a plaintiff's working conditions have been

---

[3] As to Furcron's retaliation claim, discussed *infra*, the district court adopted the Magistrate Judge's recommendation in its entirety, which would include the decision to exclude the declarations.

discriminatorily altered based on her gender. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Scalia, J., concurring); *see also Car v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994) (stating "the first [question] is whether the plaintiff was, because of her sex, subjected to such hostile, intimidating, or degrading behavior, verbal or nonverbal, as to affect adversely the conditions under which she worked."). A plaintiff must "prove that but for her sex, she would not have been subject to sexual harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). However, the "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

Some of the relevant portions of Furcron's excluded Declaration include:

- "Mr. Seligman would often have an erect penis when he was staring at me."

- "Frequently, Seligman deliberately bumped against and rubbed against me when he had an erection."

- "Mr. Seligman's actions had a significant negative impact on my job performance because I was forced to focus my attention on preventing Mr. Seligman from rubbing against me and staring at me."

- "I complained to [my manager] because I continued to feel threatened, unsafe and humiliated due to Mr. Seligman's behavior and because I could not work in a situation where I was so frequently sexually harassed."

17

- "I specifically told [my manager] that Mr. Seligman bumped against me with an erect penis."

- "When Mr. Seligman did not have a specific task, he would frequently return to my work area.  This would happen multiple times a day."

- "I frequently felt like Mr. Seligman was trying to look down my shirt and at my underwear."

These statements, as well as the statements in Johnson's excluded Declaration, *see infra* Part III.A.3, compel the conclusion that a genuine dispute of material fact exists regarding whether Seligman's constant state of arousal related to Furcron's gender.  That is, a reasonable jury could infer from this evidence that the discrimination complained of was based on sex, *Oncale*, 523 U.S. at 80, or that Furcron's work conditions were altered based on sex.  *Harris*, 510 U.S. at 25. Hence, in granting summary judgment on the sexual harassment claim, the district court either made an impermissible "weight and credibility" determination, or it excluded Furcron's Declaration on the basis of the Magistrate Judge's erroneous evidentiary ruling.  Out of deference to the district court, we assume that summary judgment was granted because it adopted the evidentiary ruling.

### 2. *The Exclusion of Furcron's Declaration*

The basis for the exclusion of portions of Furcron's Declaration was the Magistrate Judge's application of the "sham affidavit" rule.  As with other evidentiary rulings, a district court's decision to strike an affidavit as a "sham" is reviewed for abuse of discretion.  *See Telfair v. First Union Mortg. Corp.*, 216

18

F.3d 1333, 1337, 1342–43 (11th Cir. 2000).  As such, Furcron must demonstrate the district court's ruling "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."  *Westry*, 524 F.3d at 1214.

The Eleventh Circuit, in limited circumstances, allows a court to disregard an affidavit as a matter of law when, without explanation, it flatly contradicts his or her own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously.  *See Tippens*, 805 F.2d at 953–54; *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656 (11th Cir. 1984).  However, the rule only operates in a limited manner to exclude unexplained discrepancies and inconsistencies, as opposed to those "which create an issue of credibility or go to the weight of the evidence."  *Tippens*, at 953; *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012) (stating, "[where] the apparent contradiction derives not from purposeful fabrication but instead from dialectical misunderstanding . . . any apparent contradiction becomes 'an issue of credibility or go[es] to the weight of the evidence' ") (alterations in original).  Put differently, "[a]n opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose as issue of credibility."  *Tippens*, at 953. (quoting *Moore's Federal Practice* § 56.15 (2d ed. 1985))

19

(alterations in original).  In any case, the rule should be applied "sparingly because of the harsh effect it may have on a party's case."  *Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987) (internal brackets omitted).

The Magistrate Judge did not exclude Furcron's entire Declaration as a "sham affidavit," stating "[s]ome of [MCP's] arguments involve issues of credibility, impeachment, and the weight that the testimony should be given, all of which are the province of the factfinder and not the Court."  Furcron, however insists that no portion of her Declaration should have been excluded, and that in doing so the Magistrate Judge and the district court made impermissible credibility determinations.

On the sexual harassment claim, the Magistrate Judge specifically excluded statements from Furcron's Declaration on two issues: (1) the frequency at which Seligman "bumped" or "rubbed" against Furcron, and (2) whether Seligman ever touched Furcron with his erection.  As to the first, Furcron's Declaration describes Seligman's physical contacts with Furcron as "frequent[]," whereas in her deposition she described the contacts as "maybe twice a week."  Noting that Furcron and Seligman had only worked a total of six days together, the Magistrate Judge determined that to the extent "frequently" implies more than two occasions of physical touching, the Declaration contradicts her prior deposition testimony.

20

Regarding whether Seligman's erection actually came into contact with Furcron, when questioned in her deposition, Furcron testified that Seligman's lower body never came into contact with hers, and that she never touched Seligman's erection.    In her Declaration, Furcron states that Seligman rubbed against her with an erection.    The Magistrate Judge found these statements contradictory, and excluded the Declaration to the extent it alleged that Seligman touched Furcron with an erection.

Though we think the Magistrate Judge's ruling, and the district court's adoption of it, stretches the "sham affidavit" rule to its outer bounds, we cannot say that the determination "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Westry*, 524 F.3d at 1214.    That is, we cannot say the ruling amounts to a "clear error of judgment." *Conroy*, 375 F.3d at 1232.    Hence, we conclude that the Magistrate Judge's exclusion of the contradictory portions of Furcron's Declaration, and the district court's adoption of the exclusion, does not rise to the level of an abuse of discretion.

### 3. *The Exclusion of Tameka Johnson's Declaration*

MCP's motion also asked the Magistrate Judge to exclude Johnson's Declaration, arguing that Furcron failed to timely produce it in accordance with Rule 26 of the Federal Rules of Civil Procedure.    The Magistrate Judge denied

21

MCP's motion on that ground.  Nonetheless, he excluded Johnson's Declaration as "largely immaterial"—an alternative basis, and one not asserted in MCP's motion. Furcron timely and specifically objected to the Magistrate Judge's recommendation on this issue.  A timely objection to a Magistrate Judge's Report and Recommendation requires a district court to review the objected-to findings or recommendations *de novo*.  *See* 28 U.S.C. §636(b)(1).  Although the district court's order stated that it "carefully consider[ed]" any objections raised to the Report and Recommendation, the court did not address the objection in its analysis.

Nevertheless, MCP requests the district court's decision to strike Johnson's Declaration be upheld.  However, beyond a bare insistence that the Declaration was "properly excluded as immaterial" and raises "serious credibility issues," MCP offers little argument to support the point.[4]  At the outset, we note that it is entirely unclear what legal standard the Magistrate Judge and the district court applied in excluding Johnson's Declaration.  Having made no findings, "we must determine whether any reasonable view of the evidence supports [the district court's] ruling." *United States v. Bagley*, 537 F.2d 162, 167 (5th Cir. 1976).[5]

The Magistrate Judge's use of the phrase "largely immaterial" alludes to the

---

[4] The irony of arguing "credibility" as a basis for the exclusion of evidence and in support of a grant of summary judgment has not escaped the Court's notice.

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

22

"of consequence" language of Rule 401 of the Federal Rules of Evidence. *See* Advisory Committee Notes on Fed. R. Evid. 401.[6]   Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than would be the case without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  In her Declaration, Johnson swore, among other things, to the following:

- "When Mr. Seligman would stand with his hands in his pants, he would look at me in a sexual manner.  For example, he would look at my breasts and my rear when I bent over."

- "I also witness[ed] Mr. Seligman rubbing up against Myra Furcron and bumping into her."

- "Upon information and belief, Myra Furcron made a complaint of sexual harassment against Mr. Seligman."

- "Myra Furcron told me that she took [a] picture [of Mr. Seligman] in order to support her claim of sexual harassment."

Whether Furcron complained about sexual harassment to her superiors and, more importantly, whether the harassment alleged was "based on sex," are facts made more probable by the inclusion of Johnson's statements.  One of the facts to be proved by these statements—that the harassment was "based on sex"—is one

---

[6] The Advisory Committee Notes on Rule 401 state:

> "The rule uses the phrase 'fact that is of consequence to the determination of the action' to describe the kind of fact to which proof may properly be directed. The language . . . has the advantage of avoiding the loosely used and ambiguous word 'material.' "

necessary to make out a *prima facie* case for Furcron's claim, and therefore, "is of consequence in determining the action." *Id.* Hence, whatever the reliability of Johnson's sworn statements, no legal basis exists for excluding them as "largely immaterial" under Rule 401.

Moreover, no legal basis is apparent for excluding Johnson's statement under Rules 403 or 404. Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Though evidence of discrimination is not *per se* admissible under Rule 403, *Sprint/United Management Co. v. Mendhelsohn*, 552 U.S. 379, 388 (2008), there is nothing in the record that would justify an exclusion of Johnson's Declaration under one of the Rule's "danger of" considerations. Indeed, MCP has never suggested—not before the Magistrate Judge's recommendation, not in its reply to Furcron's objection to the recommendation, nor in its Brief—that the decision to exclude the Declaration should be upheld on one of those bases.

In this Circuit, Rule 404(b) permits the admissibility of so-called "me too" evidence to prove intent to discriminate and retaliation. *See Goldsmith v. Bagby*, 513 F.3d 1261, 1285–86 (11th Cir. 2008); *Phillips v. Smalley Maint. Servs., Inc.*, 711 F2d 1524, 1532 (11th Cir. 1983) (admission of coworker testimony in sexual

harassment context admissible under Rule 404(b) to prove the defendant's "motive, . . . intent, . . . [or] plan" to discriminate against plaintiff). Again, no justification for excluding Johnson's Declaration is apparent from the record.

A district court's "findings and conclusions . . . must be expressed with sufficient particularity to allow [the reviewing court] to determine rather than speculate that the law has been correctly applied." *Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc.*, 520 F.2d 1030, 1034 (5th Cir. 1975). Here, we are left to guess at the district court's reasons. Nonetheless, we find no sufficient legal basis for the district court to have excluded Johnson's Declaration. As such, it is apparent the district court reached an errant conclusion of law and abused its discretion. *See Westry*, 524 F.3d at 1214.

Moreover, we cannot conclude that the error was harmless. *See Perry*, 734 F.2d at 1446 (stating, "even if error is found it must of course rise above the threshold of harmless error") (quoting *Wallace v. Ener*, 521 F.2d 215, 222 (5th Cir. 1975). As previously discussed, on the sexual harassment claim, the district court denied summary judgment on all grounds except for the "based on sex" requirement. Johnson's Declaration—specifically her statement that Seligman would look at her breasts and buttocks in a sexual manner—suggests that Seligman's conduct was based on Johnson and Furcron's gender. That is, the inclusion of Johnson's Declaration would preclude a grant of summary judgment

grant under the district court's rationale.  Thus, "we cannot say with fair assurance," that the district court's decision "was not substantially swayed [by the exclusion]."  *Gosdin*, 803 F.2d at 1159–60.  As such, we conclude that Furcron was substantially prejudiced by the exclusion of Johnson's Declaration and hence, we are precluded from affirming the district court's evidentiary ruling.

Nevertheless, evidentiary questions are fact based inquiries, to be determined by the district court in the first instance, and we have been cautioned against engaging in this inquiry on our own.  *See Mendhelsohn*, 552 U.S. at 387–88 ("Rather than assess the relevance of the evidence itself and conduct its own balancing of its probative value and potential prejudicial effect, the Court of Appeals should . . . allow[] the District Court to make these determinations in the first instance, explicitly and on the record.").  Instead, "where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue."  *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982); *see also Mendhelsohn*, 552 U.S. at 386 ("A remand directing the district court to clarify its order is generally permissible and [is] the better approach . . . ."); *Hydrospace-Challenger*, 520 F.2d at 1034 (remand ordered where "conclusory" findings of the district court "do not provide for a sufficiently definite predicate for appellate review"); *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 638 (11th Cir. 2010) (concluding "[r]emand is the better

26

route" even though the "extensive record" may have allowed appellate court to make factual determinations on its own).

For the foregoing reasons, on the sexual harassment issue, we vacate the district court's ruling and remand the case for further proceedings consistent with this opinion.

## B. The Retaliation Claim

Furcron also argues that the district court erred in granting MCP summary judgment on the retaliation issue. Title VII's anti-retaliation provision also makes it unlawful for an employer "to discriminate against any of his employees . . . because [the employee] has opposed any [unlawful employment] practice," or because of participation in a Title VII investigation or hearing. § 2000e–3(a).

A violation of the anti-retaliation provision can be established by direct or circumstantial evidence. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). Where, as here, the plaintiff's evidence of retaliation is entirely circumstantial, the burden of proof shifts between the parties in accordance with the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brown*, 597 F.3d at 1181 (11th Cir. 2010); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).

Initially, the employee must establish a *prima facie* case by demonstrating the following essential elements: (1) the employee was engaged in statutorily

protected activity; (2) the employee suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). "Once a *prima facie* case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citing *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525–26 (11th Cir. 1991)). If the employer is able to advance legitimate reasons for the adverse employment action, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual. *Id.*; *Bryant*, 575 F.3d at 1308. "[A]t this stage . . . the plaintiff's burden . . . merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)) (internal quotation marks omitted).

### 1. *Furcron's* **Prima Facie** *Case*

As to the *prima facie* case itself, the Magistrate Judge concluded, and the district court agreed, that Furcron did not establish that she was entitled to benefit from a presumption of discrimination. Although the court found that Furcron

28

satisfied the "adverse employment action" and "causal link" elements, it determined she failed to present sufficient evidence that she had opposed an unlawful employment practice. In the district court's assessment, the evidence was not sufficient to show Furcron adequately communicated sexual harassment to her supervisors. As the other elements remain undisputed on appeal, we limit the scope of our inquiry into Furcron's *prima facie* case to determining whether her actions constitute statutorily protected activity under Title VII.

Title VII's protections are not limited to individuals who file formal complaints, but extend to those who voice informal complaints as well. *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989). However, the statute's protections only reach individuals who "explicitly or implicitly communicate[] a belief that the practice constitutes unlawful employment discrimination." EEOC Compl. Man. (CCH) § 8–11–B(2) (2006).[7]

In addition, a plaintiff is required to show that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). This burden includes both a subjective and an objective component. *Id.* That is, the plaintiff must not only show that she subjectively (i.e.,

---

[7] In August 2016, the EEOC released a Guidance Notice that supersedes the EEOC Compliance Manual's section on retaliation. *See EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004 (August 25, 2016), https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm. Nevertheless, the language in the Notice is nearly identical to the language quoted from the Compliance Manual.

29

in good faith) believed the defendant was engaged in unlawful employment practices, but also that her "belief was *objectively* reasonable in light of the facts and record present." *Id.* (emphasis in original); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010).    The objective reasonableness of her belief is measured by reference to controlling substantive law.  *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008).  Even so, the plaintiff is not required to prove that the discriminatory conduct complained of was actually unlawful.  *Little*, 103 F.3d at 960.  The conduct opposed need only "be close enough to support an objectively reasonable belief that it is."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).

MCP does not argue Furcron lacked the necessary subjective good-faith. Instead, MCP argues, and the district court agreed, that Furcron's complaints failed to adequately put her managers on notice of potential sexual harassment.  We disagree.

In her deposition[8], Furcron gave testimony that Seligman would, upon completing tasks given by other employees, return to her work area "like a magnet;" that he would stand within a foot of her while working; and that he would

---

[8] We emphasize that the foregoing testimony is all taken from Furcron's deposition and not her Declaration.  As in the sexual harassment claim, the Magistrate Judge and district court excluded portions of Furcron's Declaration relating to the "protected activity" prong of Furcron's *prima facie* case for retaliation.  Because we find that Furcron's deposition testimony is sufficient to establish her *prima facie* case, we find it unnecessary to review this specific exclusion for an abuse of discretion.

stare at her on a daily basis while she worked.  Furcron testified that she informed her manager, Maloney, that Seligman was deliberately rubbing against her and that she found it offensive.  On another occasion, she showed Maloney a photograph she had taken of Seligman's erection, and explained that she was afraid to "bend down and lift stuff up," and that it was inappropriate for her to work under those conditions.  Senior Operations Manager Wright—while not agreeing that a picture of an erect penis shown throughout the workplace automatically signals a potential sexual harassment complaint—admitted that it qualifies as a "serious incident," and "draw[s] a red flag for somebody to call [Human Resources]."  The December 5th email, while primarily stating Furcron's concerns regarding her own safety, also expressed discomfort at Seligman's constant erections.  We need not continue.

The "burden of establishing a *prima facie* case . . . is not onerous."  *Burdine*, 450 U.S. at 253.  And "workplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context . . . ."  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010).  Thus, in light of the evidence, we cannot agree with the district court that Furcron, rather than communicate her opposition to unlawful practices, merely relied on MCP to infer that discrimination had occurred.  Instead we find that the nature and severity of the conduct complained of, as well as the content of the complaints themselves, are

31

"close enough to support an objectively reasonable belief" that the conduct opposed constituted sexual harassment. *Clover*, 176 F.3d at 1351.

## 2. *MCP's Rebuttal of Furcron's* **Prima Facie** *Case*

Our inquiry is not over, however, as the *prima facie* case merely "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).  Thus, the burden shifts to MCP to rebut the presumption of discrimination by producing evidence that Furcron was terminated for a legitimate, nondiscriminatory reason.  *Id.* at 254; *City of Atmore*, 996 F.2d at 1163.  If sufficiently explained, the presumption falls away.  *Burdine*, 450 U.S. at 255.  The burden is "exceedingly light," *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988), and we need not be persuaded that the defendant was actually motivated by the reasons offered.  *Burdine*, 450 U.S. at 254.  Whether the "defendant has met its burden of production . . . involve[s] no credibility assessment."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  It is sufficient for the defendant to produce admissible evidence that raises a genuine issue of fact as to whether discrimination has occurred.  *Id*.

MCP offers three nondiscriminatory reasons for terminating Furcron: (1) that Furcron showed other employees a photograph of Seligman's crotch area in

32

violation of MCP's harassment policy; (2) that she continued to show the photograph after she was instructed by management not to; and (3) the Furcon discussed a confidential employment matter with MCP's client. MCP's rationales for terminating Furcon are supported by deposition testimony and other extrinsic evidence, which includes a policy prohibiting harassment in the form of "written or graphic material that denigrates or shows hostility or aversion toward an individual or group" on the basis of sex or disability. Furcron does not dispute that she showed a photograph of Seligman with an erect penis to other employees. MCP also produced evidence showing (1) that Furcron was told at the December 5th meeting not to discuss the company's pending investigation, and (2) that Furcron contacted Coca-Cola a short time after the meeting in violation of this directive.

MCP's evidence raises a genuine issue of fact as to the reasons for her termination. *See id.* Hence, MCP has carried its burden, and the presumption of discrimination must drop from the case. And although Furcron laments the district court's "absolute deference" to MCP's alleged reasons for the termination "despite conflicting evidence," we remind her the determination at this stage "can involve no credibility assessment." *Hicks*, 509 U.S. at 509. Thus, the burden shifts back to Furcron to demonstrate pretext. *City of Atmore*, 996 F.2d at 1163; *Bryant*, 575 F.3d at 1308.

33

### 3. *Pretext*

As MCP has adequately articulated legitimate, nondiscriminatory reasons for the termination, the burden shifts to Furcron "to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by [MCP] were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256).

Furcron is entitled to survive summary judgment only "if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Id.* at 1529. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext . . . ." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 443–44 (11th Cir. 1996)). To show pretext, the evidence produced "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)) (internal quotation marks omitted). In

short, Furcron must meet each proffered reason "head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Far from addressing each of MCP's rationales "head on," Furcron argues, matter-of-factly, that she violated no work rules. Instead, she asserts, her photographing of Seligman's erection was at the direction of a former supervisor, who instructed her to photograph any improprieties she witnessed in the workplace. Notwithstanding the wisdom of the alleged instructions, or whether they could reasonably be understood to apply to this particular set of circumstances, the argument does little to weaken MCP's claim that Furcron's conduct violated the clear terms of their policy proscribing harassment. And even if we assume that the directive to not show the photograph to other individuals was only given at the December 5th meeting, it likewise does not follow that no violation of MCP's policy took place prior to the meeting.

As it appears the terms of MCP's harassment policy are directed specifically to this type of conduct—and Furcron does not argue otherwise—her showing photographs of Seligman's crotch area to other co-workers would, presumably, amount to a violation. Indeed, Senior Operations Manager Wright characterized the conduct as "draw[ing] a red flag for somebody to call [Human Resources]." Moreover, Wright gave uncontradicted testimony that he had instructed Furcron to

not take pictures of associates on a prior occasion.  Thus, Furcron's argument on this point amounts to "quarrelling with the wisdom" of MCP's given reasons for termination, rather than exposing inconsistencies and contradictions in those reasons.  *Id.*

Furcron fares no better with her final argument.  She contends that in her Separation Notice, MCP "does not state that [Furcron] showed the picture of Seligman in violation of orders, nor does it make any mention of [Furcron] contacting [MCP's] client regarding the incidents with Seligman; it accuses her of engaging in sexual harassment by taking the photograph."  This, she says, is evidence of how MCP's rationales for termination have evolved throughout the litigation.  The Separation Notice reads, under "Reason for Separation:"

> Taking sexually suggestive pictures of a male Associate's "private area" without his permission or knowledge, stored them in her camera and displayed the pictures to several other Associates.  The actions of Ms. Furcron were unwelcomed and have been deemed offensive and disrespectful and not appropriate for the workforce.  On December 5, 2012 Myra was suspended after admitting that she had in fact taken the picture without the Associate's knowledge and showed it to the other Associates.

This does not appear to the Court to qualify as evidence of "evolving rationales" on the part of MCP.  In fact, the statement is fully consistent with the first nondiscriminatory reason offered for termination—that Furcron showed other employees a photograph of Seligman's crotch area in violation of MCP's

36

harassment policy. Moreover, the additional two rationales do not contradict the statement in the Separation Notice, and neither are they inconsistent with it. Furcron's burden here is to produce sufficient evidence as to *each* of MCP's proffered reasons. *Combs*, 106 F.3d 1529. We conclude that the allegations here are not sufficient to raise an inference of pretext and thus, MCP is entitled to summary judgment on the retaliation issue.

## IV. CONCLUSION

For the foregoing reasons, the district court's entry of summary judgment for MCP on the sexual harassment claim is VACATED and REMANDED for further proceedings consistent with this opinion. On the retaliation claim, the district court's entry of judgment for MCP is AFFIRMED.