[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 19-14228

————————————————

D.C. Docket No. 1:17-cv-02887-ELR

PHYLLIS MORELAND-RICHARDSON,

Plaintiff-Appellant,

versus

CITY OF SNELLVILLE, GEORGIA,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————————

(September 29, 2021)

Before ROSENBAUM, LUCK, and JULIE CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiff-Appellant Phyllis Moreland-Richardson appeals the district court's order granting summary judgment to Defendant-Appellee the City of Snellville on the Title VII race discrimination and retaliation claims Plaintiff asserted against the City after she was terminated from her position as city clerk in November 2015. After a careful review of the record, and with the benefit of oral argument, we affirm.

## BACKGROUND

In January 2014, then-Mayor Kelly Kautz unilaterally appointed Plaintiff, a black female, to be the city clerk for the City of Snellville. She did so without the knowledge or consent of Snellville's city council and despite the fact that Plaintiff's appointment required the removal of Melissa Arnold, a white female who had served as Snellville's city clerk since 2009 and who had been a City employee for twenty-three years at the time of Plaintiff's appointment.[1]

The city council disagreed with Kautz's decision to replace Arnold with Plaintiff, and it questioned Kautz's authority to unilaterally appoint a new city clerk without its consent or approval when the position was not vacant. Accordingly, the council passed a resolution reinstating Arnold as city clerk

---

[1] Plaintiff does not dispute that Kautz unilaterally appointed her to the city clerk position, but she argues that the Snellville Charter authorized the unilateral appointment.

effective January 13, 2014.  Meanwhile, Kautz sued the city council to determine her authority as mayor to appoint the city clerk.

On June 20, 2014, Kautz reached a settlement in her litigation with the city council, in which the council agreed that Kautz had the authority to unilaterally replace Arnold with Plaintiff in the city clerk position.  Pursuant to the settlement, Arnold resigned.  Plaintiff resumed her duties as city clerk after a city council meeting that was specially called on June 26, 2014 for the purpose of reinstating Plaintiff.

The city council passed two resolutions during the June 26, 2014 meeting. In the first resolution, the city council adopted a job description for the city clerk position that formally removed from the position certain administrative functions Arnold had assumed during her tenure with the City that were beyond her duties as city clerk, including acting as the City's bid administrator and purchasing agent and managing the City's IT personnel.[2]  The second resolution set Plaintiff's starting salary as city clerk at $46,000 a year, which was $6,500 lower than Arnold's salary of $52,500 when she was appointed city clerk in 2009.

---

[2]  Plaintiff stated in her summary judgment response below that Arnold served only as a "backup" in these roles for individuals who were absent, but that does not conflict with—on the contrary, it supports—the City's argument that Arnold had assumed extra-clerk duties during her tenure.  Plaintiff stated further that the city council's resolution "unilaterally stripped" her of duties that historically had been performed by the city clerk, but the evidence she cited did not support that assertion, and she did not dispute that the bid administrator, purchasing agent, IT manager, and similar functions were not traditional city clerk duties.

3

In November 2015, city council member Tom Witts defeated Kautz in the Snellville mayoral race. When Witts took office on November 9, 2015, he called a city council meeting during which the council voted to approve a resolution appointing a new city clerk and city attorney. Pursuant to the resolution, Plaintiff was removed from the city clerk position and replaced with interim city clerk Ariann Stone, a white female.[3] Plaintiff's removal occurred approximately two months before her term was set to expire on January 10, 2016.

Plaintiff claims she experienced racial discrimination and harassment throughout her tenure as city clerk, up to and including her termination in November 2015. In support of her claim, Plaintiff cites the discrepancy between her own and Arnold's starting salary as city clerk, the city council's removal of certain duties Arnold had performed while she worked for the City upon Plaintiff's appointment to the city clerk position, and various workplace affronts, including being accused of misconduct and incompetence and having her vacation leave questioned, among other things.

Plaintiff complained about some of these issues in an interview she gave to a local television station in July 2014, about three weeks after her reinstatement as city clerk. Although Plaintiff never complained directly to the City, the City hired outside investigator David Archer to investigate Plaintiff's allegations. The

---

[3] The city council subsequently voted to reinstate Melissa Arnold as city clerk.

4

investigation was hampered, however, by Plaintiff's refusal to be interviewed or otherwise cooperate. Nevertheless, after interviewing city council members and other city employees, reviewing relevant newspaper articles and city ordinances, and viewing footage of city council meetings, Archer determined there was no evidence to support Plaintiff's allegations. He concluded, instead, that Plaintiff had been "thrust into an ongoing power struggle between [Mayor Kautz] and City Councilmembers that had no nothing to do with race" and that Plaintiff's predecessor Arnold "had earned the friendship, respect, and loyalty of her co-workers and all of the members of the City Council during her long tenure with the City, and that they were upset by what they perceived as Kautz's unfair treatment" of her.

Plaintiff did not challenge the results of Archer's investigation, and she did not avail herself of the City's internal policy and procedures for reporting and investigating discrimination and harassment claims. Nevertheless, Plaintiff claims she continued to experience racially discriminatory and hostile treatment at work. In March 2015, Plaintiff filed an EEOC charge. In the charge, Plaintiff alleged that the city council had resisted and opposed her appointment from the beginning, had paid her less than her white predecessor and reduced her job duties when it was forced to acquiesce in her appointment, and had created a racially hostile work

5

environment after Plaintiff assumed the city clerk position by treating her in an "intimidating, hostile[,] and offensive" manner.

Plaintiff remained in the city clerk position for approximately eight months after she filed her March 2015 charge, at which time she was terminated pursuant to the city council's vote to appoint a new city clerk and city attorney after council member Witts defeated Kautz in the Snellville mayoral race. Following her termination, Plaintiff filed a second EEOC charge in May 2016, alleging that she was terminated in retaliation for her March 2015 EEOC charge.

Plaintiff subsequently filed this lawsuit asserting race discrimination, racial harassment, and retaliation claims under Title VII.[4] After discovery, the City moved for summary judgment as to Plaintiff's claims. The City's motion was referred to a Magistrate Judge, who issued a Report and Recommendation ("R&R") recommending that the motion be granted.

As to Plaintiff's race discrimination claims, the Magistrate Judge concluded that Plaintiff had not shown she was treated differently than a similarly situated white employee with respect to her pay or job duties, and that she had failed to respond to the City's argument that she was not qualified for the city clerk position

---

[4] Plaintiff also asserted discrimination and retaliation claims under 42 U.S.C. § 1981, but the Magistrate Judge determined that Plaintiff had abandoned those claims. Plaintiff did not object to that determination below, and she does not challenge it on appeal. Accordingly, we do not consider Plaintiff's § 1981 claims.

6

at the time of her termination, as required to establish a prima facie case of discrimination.  Alternatively, the Magistrate Judge determined that Plaintiff had presented no evidence of pretext in response to the City's legitimate, nondiscriminatory explanation for its decisions with respect to Plaintiff's pay, job duties, and termination.  With respect to her racial harassment allegations, the Magistrate Judge concluded that Plaintiff had not shown severe or pervasive harassment, as required to prevail on a hostile work environment claim, and that she had failed to refute the City's argument that it was not liable for Plaintiff's allegedly hostile work environment pursuant to the affirmative defense set out in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).  Finally, regarding Plaintiff's retaliation claim, the Magistrate Judge found no evidence that Plaintiff's termination (the alleged retaliatory action) was in any way related to her March 2015 EEOC charge (the alleged protected conduct).

Plaintiff objected to some, but not all, of the Magistrate Judge's recommendations in the R&R.  Specifically, Plaintiff objected to the Magistrate Judge's conclusions that she had not shown:  (1) that she was treated differently than a similarly situated white employee, (2) that the City's asserted legitimate, nondiscriminatory reasons for its adverse actions against Plaintiff were a pretext for race discrimination, and (3) that the hostility Plaintiff experienced during her

tenure as city clerk was race-related and sufficiently severe or pervasive to be actionable. Plaintiff also objected to the Magistrate Judge's determination that her termination was not causally related to her March 2015 EEOC charge. Plaintiff did not object to the Magistrate Judge's conclusion that she was not qualified for the city clerk position at the time of her termination or his determination that there was no basis for imposing liability on the City for Plaintiff's allegedly hostile work environment under *Faragher* and *Ellerth*.

The district court denied Plaintiff's objections, accepted the Magistrate Judge's recommendations, and granted summary judgment to the City on all the claims asserted by Plaintiff. This appeal followed.

## DISCUSSION

### I.    Standard of Review

We review the district court's summary judgment ruling in favor of the City de novo, construing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). Viewing the evidence in that manner, summary judgment is appropriate if the City shows that there are no genuine issues of material fact and that the City "is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a) (quotation marks omitted)).

8

As discussed above, Plaintiff objected to some of the Magistrate Judge's conclusions, but not all of them.  Eleventh Circuit Rule 3-1 states that:

> A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object.  In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice.

11th Cir. R. 3-1.

The notice Plaintiff received with the R&R in this case "informed [her] of the time period for objecting and the consequences on appeal for failing to object." *See id.*  Specifically, the notice advised Plaintiff of the fourteen-day period for filing objections and explained, "If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court, and on appeal, the Court of Appeals will deem waived any challenge to <u>factual and legal findings</u> to which there was no objection, subject to interests-of-justice plain error review.  11th Cir. R. 3-1." (emphasis added).  Plaintiff has thus waived the right to challenge on appeal any rulings by the district court that are based on the Magistrate Judge's unobjected-to conclusions.  *Compare Harrigan v. Metro Dade Police Dep't Station No. 4*, 977 F.3d 1185, 1191 (11th Cir. 2020) (holding that Rule 3-1 was not satisfied by a notice informing the plaintiff that she would waive

9

any right to appeal unobjected-to factual findings but that did not mention unobjected-to legal conclusions).

## II.    Plaintiff's Title VII Discrimination Claims

Title VII of the Civil Rights Act of 1964 forbids covered employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Plaintiff claims the City violated Title VII in two ways. First, Plaintiff argues that the City discriminated against her by paying her less than a comparable white employee, stripping her of the discretionary functions the white employee performed as city clerk, and ultimately terminating her on account of her race. Second, Plaintiff argues that the City subjected her to a racially hostile environment that negatively impacted the conditions of her employment as city clerk, as evidenced by various affronts Plaintiff allegedly experienced in the workplace. For the reasons discussed below, we affirm the district court's order granting summary judgment to the City as to both of Plaintiff's Title VII discrimination claims.

### A.    Race Discrimination as to Plaintiff's Pay, Job Duties, and Termination

Plaintiff conceded below that she has no direct evidence she was terminated, paid less, or assigned fewer job duties on account of her race. The Magistrate Judge thus correctly applied the *McDonnell Douglas* burden-shifting framework to

10

Plaintiff's race discrimination claim based on her termination and alleged pay and job duty disparities. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) ("In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor. One way that she can do so is by satisfying the burden-shifting framework set out in *McDonnell Douglas*.").

Pursuant to the *McDonnell Douglas* framework, Plaintiff has the initial burden to establish a prima facie case of discrimination by showing that (1) she belongs to a protected class, (2) she suffered an adverse employment action with respect to her position with the City, (3) she was qualified for her position at the time of the adverse action, and (4) an employee outside of Plaintiff's protected class was treated more favorably than Plaintiff. *See id.* at 1220–21. The burden then shifts to the City to articulate a legitimate, nondiscriminatory reason for its challenged employment decisions. *See id.* at 1221. Assuming the City satisfies that requirement, the burden shifts back to Plaintiff to show that the City's proffered reason was not the real basis for the decision, but a pretext for discrimination. *See id.* As discussed below, Plaintiff's discrimination claims based on both her termination and the pay and job duty disparities she alleges in her complaint fail at the prima facie stage of the analysis.

1. Plaintiff failed to establish below, and she has waived on appeal, an essential element of her prima facie case of discrimination based on

her termination—namely, that she was qualified for the city clerk position at the time of her termination.

It is undisputed that Plaintiff has satisfied the first two elements of a prima facie case of discrimination based on her termination: Plaintiff is a member of a protected class and she suffered an adverse employment action when she was terminated from the city clerk position in November 2015. We likewise assume that Plaintiff has established the last element of her prima facie case as to her termination by showing that she was replaced in the city clerk position with a white interim city clerk, Ariann Stone, and ultimately with a white permanent city clerk, Melissa Arnold. *See Maynard v. Bd. of Regents of the Div. of Univ. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (noting that a plaintiff can make out a prima facie case of discrimination with evidence that he was "replaced by a person outside his protected class"). Nevertheless, Plaintiff's termination claim fails at the prima facie stage of the analysis because Plaintiff did not respond below to the City's argument that she was not qualified for the city clerk position at the time of her termination, and she did not object to the Magistrate Judge's determination that she had thus failed to establish this essential element of a prima facie case of discrimination based on her termination.

In its summary judgment briefing below, the City specifically argued that Plaintiff was not qualified for the city clerk position when she was terminated in November 2015 because she had failed to meet the performance expectations of

12

the position over the course of her tenure as city clerk, and because Plaintiff's demonstrated allegiance to Mayor Kautz resulted in a lack of trust by the city council in her ability to loyally serve the incoming Witts administration. Instead of responding to the City's arguments as to the qualification element of her prima facie case, Plaintiff inaccurately asserted in her own summary judgment briefing that it was undisputed that she was qualified for the city clerk position. Because Plaintiff failed to respond to the City's argument that she was unqualified for the city clerk position at the time of her termination, the Magistrate Judge concluded that Plaintiff could not establish this essential element of her prima facie case of discrimination arising from her termination.

As noted above, Plaintiff subsequently failed to object to the Magistrate Judge's conclusion that she failed to show she was qualified for the city clerk position when she was terminated and, consequently, that she could not make out a prima facie case of discrimination based on her termination.[5] Again, Plaintiff was informed of the fourteen-day objection period when the Magistrate Judge's R&R issued, and she was advised that the consequence for not objecting included a

---

[5] Plaintiff vaguely stated in her objections that the City's argument that she "was not qualified to serve as city clerk after the 2015 election because [her] allegiance to the former mayor resulted in a lack of trust to maintain the confidence of matters pertaining to new elected Mayor and City Council [sic], is nothing more than speculation and carry [sic] no merit." Assuming that statement qualifies as a valid objection despite the lack of any evidence or argument to support it, Plaintiff failed entirely to object to the Magistrate Judge's alternative finding that she was not qualified for the city clerk position due to performance issues.

13

waiver of her "right to challenge on appeal the district court's order" granting summary judgment based on any of the Magistrate Judge's "unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1. Thus, after essentially conceding below that she was not qualified for the city clerk position at the time of her termination, Plaintiff thereafter waived the right to raise the qualification issue on appeal by failing to object to the Magistrate Judge's R&R on this point.

Rule 3-1 states that "[i]n the absence of a proper objection, . . . the court may review on appeal for plain error if necessary in the interests of justice." *Id.* But the plain error doctrine "rarely applies in civil cases." *Ledford v. Peeples*, 657 F.3d 1222, 1258 (11th Cir. 2011). *See also Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1352 (11th Cir. 2017) ("In an exceptional civil case, we might entertain [an] objection [that was not raised below] by noticing plain error." (quotation marks omitted)). We find no plain error in the Magistrate Judge's determination that Plaintiff failed to show she was qualified for the city clerk position at the time of her termination. The City argued in its summary judgment briefing below that Plaintiff was not qualified for the city clerk position at the time of her termination due to Plaintiff's performance issues throughout her tenure as city clerk and the city council's belief that Plaintiff could not effectively serve the incoming Witts administration given her demonstrated loyalty to Kautz. The City cited evidence in support of both prongs of its argument, which Plaintiff failed to rebut. Indeed,

14

Plaintiff failed to respond in any way to the City's argument that she was not qualified for the city clerk position other than to state, incorrectly, that the issue was undisputed.  Plaintiff having essentially abandoned this essential element of her prima facie termination claim below and waived the right to raise the issue on appeal, her termination claim fails at the first stage of the *McDonnell Douglas* analysis.

2.    <u>Plaintiff cannot establish a prima facie case of discrimination based on pay and job duty disparities between herself and a similarly situated employee outside her protected class.</u>

Applying *McDonnell Douglas* to Plaintiff's pay and job duty claim, we again assume Plaintiff is a member of a protected class and that the City's decision to pay her a lower starting salary and assign her fewer duties than her white predecessor, Melissa Arnold, constitutes adverse action.  The City has not argued that Plaintiff was unqualified for the city clerk position when the city council passed the June 26, 2014 resolution setting her salary and defining her job duties, so we likewise assume Plaintiff has satisfied that element of her prima facie case for purposes of her pay and job duty claim.  But to move beyond the first stage of *McDonnell Douglas* on her pay and job duty claim, Plaintiff must show that she was treated less favorably than a "similarly situated" employee outside her protected class with respect to her pay and job duties.  *See Lewis*, 918 F.3d at 1221, 1224.  In other words, Plaintiff must produce valid comparator evidence showing

that she was treated less favorably than a similarly situated white employee with respect to her pay and job duties as city clerk. *See id.* at 1224 ("In order to defeat summary judgment, a Title VII plaintiff proceeding under *McDonnell Douglas* must prove, as a preliminary matter, not only that she is a member of a protected class, that she suffered an adverse employment action, and that she was qualified for the job in question, but also that she was treated less favorably than similarly situated individuals outside her class." (quotation marks omitted)). She cannot.

This Court clarified in *Lewis* that an employee must be similarly situated to the plaintiff "in all material respects" to serve as a comparator for purposes of the *McDonnell Douglas* analysis. *Id.* at 1224. As the Court explained in *Lewis*, that formulation is derived from the ordinary meaning of the term "discrimination": that is, "the act of treating *like* cases differently" based on a protected characteristic. *Id.* at 1225 ("[I]n adopting a comparator standard, we must not stray too far from paradigmatic notions of discrimination, lest we sanction a regime in which treating *different* things differently violates Title VII, which clearly it does not." (quotation marks omitted) (emphasis in original)). In addition, it serves the two main functions of the prima facie prong of the *McDonnell Douglas* analysis: (1) eliminating the "most common nondiscriminatory reasons for an employer's conduct" and (2) providing "a sound basis for an inference of unlawful discrimination." *Id.* (quotation marks omitted).

16

With the above considerations in mind, the Court in *Lewis* identified "the sorts of similarities" that qualify an employee as a comparator for purposes of the *McDonnell Douglas* analysis. *See Lewis*, 918 F.3d at 1227–28. The Court explained, for example, that a comparator generally will have (1) engaged in the same conduct or misconduct, (2) been subject to the same employment policy or rule, (3) worked under the same supervisor, and (4) shared the same employment or disciplinary history as the plaintiff. *See id.* However, the Court emphasized that these factors do not necessarily apply in every case, and that they should not be applied in an overly formalistic way. *See id.* at 1228. Rather, they should be considered with a view to determining whether the material "likenesses" between the plaintiff and the proffered comparator in a particular case "eliminat[e] the most common nondiscriminatory reasons" for an employer's differential treatment of the two employees and justify "an inference of unlawful discrimination" by the employer. *See id.* (citation omitted).

Plaintiff argues that her white predecessor, Melissa Arnold, can serve as a valid comparator with respect to her discrimination claim related to her pay and job duties. It is undisputed that Arnold's salary when she was appointed city clerk in 2009 was $6,500 higher than Plaintiff's starting salary upon her appointment to the same position in 2014, and that some of the functions Arnold was performing during her tenure as city clerk—for example, acting as the City's purchasing agent

17

and bid administrator and managing the City's IT personnel—were formally removed from the city clerk position when Arnold vacated the position to make way for Plaintiff's reinstatement in June 2014. Arguably then, the City treated Arnold more favorably than it treated Plaintiff by paying her a higher starting salary and entrusting her with additional job duties.

However, it is also undisputed that Arnold had worked for the City for eighteen years, over half of which she spent working directly in the city clerk's office as an assistant or deputy city clerk, when she was appointed to the city clerk position in 2009, whereas Plaintiff had no employment history with the City and she lacked Arnold's direct experience working in a city clerk's office at the time of her own appointment in 2014.[6] Further, Plaintiff has not refuted the City's evidence that the functions the city council removed from the city clerk position upon Plaintiff's appointment in 2014 were outside of Arnold's responsibilities as city clerk, and that Arnold had assumed those functions in accordance with the multi-faceted role she played during her long tenure with the City. Given the undisputed differences between Arnold and Plaintiff's employment history with

---

[6] Plaintiff stated in her summary judgment response that she "had work experience as a Deputy Clerk for Miami-Dade County." Apparently, Plaintiff is referring to a former position she held with the Miami-Dade County Board of Commissioners, in which she "was responsible for keeping minutes." Minute keeping remained a responsibility of Plaintiff's after she was appointed to the city clerk position in Snellville, but there is no evidence Plaintiff performed a role with the Miami-Dade County Board of Commissioners that was similar to the role Arnold had assumed during her long tenure with the City.

18

the City, there is no reasonable basis upon which to conclude that Arnold was similarly situated to Plaintiff in all material respects relevant to her pay or job duties as city clerk. *See Lewis*, 918 F.3d at 1228 (citing authority for the principle that "differences in experience . . . can disqualify a plaintiff's proffered comparators" (quotation marks omitted)).

Regarding Plaintiff's pay claim specifically, Plaintiff complains that her salary when she was appointed city clerk was $46,000, which was $6,500 lower than Arnold's salary of $52,500. But Plaintiff acknowledges that the City determined her salary by taking an average of the starting salary of city clerks in similar, neighboring communities, in a process that was race-neutral on its face. It is not surprising that the figure derived from that process would differ from Arnold's salary upon being appointed to the city clerk position, which would not have required a salary survey because Arnold was already on the City's payroll—and had been on the City's payroll for eighteen years—at the time of her appointment in 2009. And it is only natural that Arnold, an eighteen-year City employee with a proven work history and nine years of directly relevant experience in the city clerk's office, would garner a higher salary than a new hire who did not have the same experience with the City or in a city clerk's office. Indeed, Plaintiff does not dispute the City's assertion that Arnold's higher salary

19

"took into consideration her years of service, experience and performance, and the scope of her job duties and responsibilities."

As to Plaintiff's job duties claim, Plaintiff complains that when she was appointed city clerk in 2014, the City redefined the position to remove various functions Arnold had performed when she was city clerk, such as managing the City's IT department and acting as the City's purchasing agent and bid administrator. But again, Plaintiff failed to rebut the City's evidence showing that those functions were outside Arnold's responsibilities as city clerk, and that they were performed by Arnold in addition to her city clerk duties. Further, it is undisputed that during Arnold's eighteen years of employment with the City that preceded her appointment as city clerk, Arnold proved herself to be a trusted and reliable—and according to even Kautz a "dedicated"—employee who wore many hats for the City and who had extensive institutional knowledge. Thus, at the time of her appointment to the city clerk position in 2014, Plaintiff was not similarly situated to Arnold with respect to her proven ability to competently perform the extra-clerk functions Arnold had assumed over the course of her eighteen years working for the City at the time of Arnold's appointment to the city clerk position in 2009 and her twenty-three years working for the City when she vacated the position to make way for Plaintiff's appointment in 2014.

20

Plaintiff claims in her appellate briefing that she had thirty-five years of experience working in government before her appointment to the city clerk position in 2014, including experience working as a deputy clerk for the Miami-Dade County Board of Commissioners, where she was responsible for keeping minutes. But Plaintiff does not argue that her experience with the Miami-Dade County Board of Commissioners involved any of the administrative and supervisory duties the city council formally removed from the city clerk position upon Plaintiff's appointment in 2014, nor present any evidence showing that the Miami-Dade County position she held is comparable to a city clerk or a deputy city clerk position.

In short, applying the analysis required by *Lewis* to the evidentiary record in this case, Arnold is not a valid comparator against which to measure Plaintiff's alleged discriminatory treatment with respect to her pay or job duties as city clerk. Once again, the standard adopted in *Lewis* is intended to "eliminat[e] the most common nondiscriminatory reasons" an employer would have for treating a comparator more favorably than the plaintiff, thus justifying "an inference of intentional discrimination." *See Lewis*, 918 F.3d at 1228 (citation omitted). No such inference is warranted here, where the City's decisions as to Plaintiff's starting salary and job duties relative to Arnold are explained by one of the most common nondiscriminatory reasons there is: a vast disparity between Arnold and

21

Plaintiff's experience and work history with the City.  *See id.* (noting that a similarly-situated comparator will ordinarily share the plaintiff's employment history, such that they "cannot reasonably be distinguished") (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015)); *see also Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008) (holding that the plaintiff's co-worker, who had been employed by the defendant for several years longer than the plaintiff and had "specialized and highly valued expertise" related to the position in issue was not a proper comparator).  Because Arnold does not qualify as a comparator, and because Plaintiff does not present evidence showing that any other employee was treated more favorably than she was with respect to pay or job duties, her pay and job duty disparity claim fails at the prima facie stage of the *McDonnell Douglas* analysis.

3.    Plaintiff cannot survive summary judgment on the "convincing mosaic" alternative to *McDonnell Douglas* that is available in certain cases where comparator evidence is lacking.

We recognize that a plaintiff's discrimination claim can survive summary judgment, notwithstanding her failure to establish a *prima facie* case of discrimination under *McDonnell Douglas*, if she presents a "convincing mosaic of circumstantial evidence" that creates a triable issue about the employer's discriminatory intent.  *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (noting that a "convincing mosaic of circumstantial evidence"

22

may "allow a jury to infer intentional discrimination"). For example, in the absence of valid comparator evidence, a plaintiff may present evidence such as "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent" with respect to a challenged employment decision might be drawn. *See Lewis*, 934 F.3d at 1185 (quotation marks omitted). Plaintiff expressly invoked *McDonnell Douglas* in her summary judgment briefing below, and she did not present any alternative method of demonstrating an inference of discrimination on the part of the City. But in any event, Plaintiff has failed to produce other evidence from which a jury could reasonably infer that the City discriminated against Plaintiff, on the basis of her race, with respect to her salary, assigned job duties, or termination from the city clerk position.

As discussed above, it is undisputed that the City determined Plaintiff's starting salary by conducting a salary survey of city clerks in comparable, neighboring communities, and taking an average of those salaries. Nothing about that process indicates a racial motivation, and Plaintiff's only complaint about her salary is that it was $6,500 less than her predecessor Arnold's salary. But again, Plaintiff was a new hire when she was appointed city clerk in 2014 whereas Arnold was an eighteen-year employee of the City at the time of her appointment in 2009. Further, Plaintiff failed to refute the City's evidence that the functions it removed

23

from the city clerk position upon Plaintiff's appointment were extra-clerk functions Arnold had assumed during her long tenure as a City employee who had extensive institutional knowledge and who had assumed many functions in her role with the City, several of which were outside her duties as city clerk.  Finally, Plaintiff failed to object to or otherwise challenge the Magistrate Judge's determination that the City terminated Plaintiff because she failed to meet performance expectations during her tenure and because the city council doubted her ability to effectively serve the incoming Witts administration, given her demonstrated loyalty to Kautz.

## B.    Hostile Work Environment

To prevail on a hostile work environment claim, a plaintiff must show that she was subjected to "severe or pervasive" harassment that was "motivated by" a protected characteristic under Title VII, in this case Plaintiff's race.  *See Tonkyro v. Sec'y, Dep't of Veterans Affairs*, 995 F.3d 828, 836–37 (11th Cir. 2021) (quotation marks omitted).  Harassment is sufficiently severe or pervasive to be actionable when it results in a work environment that an employee "subjectively perceive[s]" as hostile and abusive, and "that a reasonable person would find hostile or abusive" based on its frequency, severity, physically threatening nature, and interference with an employee's job performance.  *See id.* (citation and internal quotation marks omitted); *see also Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1152 (11th Cir. 2020) ("A hostile work environment claim under Title VII requires proof that the

24

workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.") (citation and internal quotation marks omitted). The severe or pervasive standard is intended to be "sufficiently demanding to ensure that Title VII does not become a general civility code." *Tonkyro*, 995 F.3d at 837 (citation and internal quotation marks omitted).

Assuming an employee meets the above requirements and otherwise establishes the essential elements of a hostile work environment claim, the employer is entitled to assert the affirmative defense to liability set out in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (the "*Faragher/Ellerth* defense"). *See Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001) (applying *Faragher* and *Ellerth*). Under *Faragher/Ellerth*, when a supervisor's harassment results in a tangible adverse employment action, the employer "automatically [is] vicariously liable" for the harassment. *See id.* On the other hand, when the harassment does not culminate in a tangible employment action, the "employer may raise an affirmative defense to liability." *Ellerth*, 524 U.S. at 765. The defense has two necessary elements: (1) that "the employer exercised reasonable care to prevent" and promptly correct any harassing behavior, and (2) that "the plaintiff employee unreasonably failed to take advantage of any preventive or

25

corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof" on each. *Frederick*, 246 F.3d at 1313.

The Magistrate Judge concluded that the City was entitled to summary judgment on Plaintiff's hostile work environment claim for two reasons. First, he determined that Plaintiff had failed to present evidence that she was subjected to severe or pervasive harassment in the workplace that was motivated by her race. As an alternative ground, he determined that the City had established both elements of the *Faragher/Ellerth* defense with evidence that it maintained an anti-harassment policy for preventing and correcting unlawful harassment, and that Plaintiff was aware of the policy but failed to avail herself of it.

Because we conclude that the Magistrate Judge correctly determined that Plaintiff waived her right to argue that the City is liable under the *Faragher/Ellerth* defense, we need not consider whether Plaintiff was subjected to severe or pervasive harassment in the workplace that was motivated by her race. The City specifically asserted the *Faragher/Ellerth* defense in its summary judgment briefing below, arguing that it was not liable for Plaintiff's alleged harassment because it maintained an anti-harassment policy and procedure for reporting and resolving racial harassment claims, and that Plaintiff was made aware of the policy but failed to avail herself of it. Plaintiff essentially conceded the issue by failing to

26

respond to the City's evidence.  For example, Plaintiff did not present any evidence that might have raised an issue of fact as to whether the City effectively disseminated or rigorously enforced its policy.  *Compare Frederick*, 246 F.3d at 1311.  Instead, Plaintiff argued that that the City was strictly liable for the harassment she alleged because it resulted in a tangible adverse employment action.  The Magistrate Judge rejected Plaintiff's strict liability argument and determined that the City had established both elements of the *Faragher/Ellerth* defense by presenting undisputed evidence that it maintained a non-harassment policy that provided a process for racial harassment complaints to be reported to human resources and investigated, which Plaintiff acknowledged she received and understood but never used.

As noted, Plaintiff did not object to the Magistrate Judge's determination that the City had established the essential elements of the *Faragher/Ellerth* defense and was thus entitled to summary judgment on her hostile work environment claim.  Pursuant to 11th Circuit Rule 3-1, Plaintiff has therefore waived any right to argue on appeal that the City is not entitled to the defense.  And again, we find no plain error here.  Plaintiff failed to rebut the City's evidence that it maintained an anti-harassment policy, and that Plaintiff knew about the policy but failed to utilize it.  Plaintiff's only response to the City's *Farager/Ellerth* argument was that the incidents she cited in support of her hostile work environment claim somehow

27

constituted tangible adverse action.  It was not plain error for the Magistrate Judge to reject that argument.  *See id.* at 1312 ("[W]e treat [the plaintiff's] *'quid pro quo'* claim as an adverse 'tangible employment action' claim, and her 'hostile environment' claim as one in which no adverse 'tangible employment action' occurred.").  Thus, even assuming Plaintiff could show severe or pervasive racial harassment, she cannot prevail on her hostile work environment claim asserted against the City because she essentially conceded below and has waived on appeal the *Faragher/Ellerth* issue.  Accordingly, we affirm the district court's order granting summary judgment to the City on Plaintiff's hostile work environment claim.

### III.    Plaintiff's Retaliation Claim

Plaintiff claims that the city council terminated her on November 9, 2015 in retaliation for the EEOC charge she filed on March 3, 2015.  Like her race discrimination claim, Plaintiff's retaliation claim is based on circumstantial evidence and thus is analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) ("When a Title VII retaliation claim . . . is based on circumstantial evidence, this Circuit utilizes the three-part *McDonnell Douglas* burden-shifting framework." (citation and footnote omitted)).  As that framework is applied in the retaliation context, the plaintiff must first establish a prima facie case of retaliation by

28

showing that:  (1) she engaged in statutorily protected conduct—that is, conduct protected by Title VII, (2) she suffered an adverse employment action, and (3) "there is some causal relationship between the two events." *Id.* (citation and internal quotation marks omitted).  The burden then shifts to the defendant employer to articulate a legitimate, nonretaliatory reason for the adverse action.  *Id.* Assuming the defendant makes the required showing, the burden shifts back to the plaintiff to prove that "the reason offered by the defendant was not the real basis for the decision, but a pretext" for retaliation.  *Id.* (citation and internal quotation marks omitted).

As to Plaintiff's prima facie case, the City concedes that Plaintiff engaged in protected activity when she filed the March 2015 EEOC charge and that she suffered an adverse employment action when she was terminated in November 2015, but it argues there is no causal link between those two events.  To establish causation at the prima facie stage of the analysis, Plaintiff must show that her protected activity (the March 2015 EEOC charge) and the alleged adverse action (her November 2015 termination) were not "wholly unrelated." *See Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1294 (11th Cir. 2021) (citation omitted).  Even under that lenient standard, we agree with the Magistrate Judge that Plaintiff did not present enough evidence of causation to establish a prima facie case of retaliation.

As explained in the R&R, the eight-month delay between Plaintiff's March 2015 EEOC charge and her November 2015 termination is too long to infer causation based on temporal proximity. *See Johnson*, 948 F.3d at 1327–28 ("[M]ere temporal proximity, without more, must be very close to suggest causation in a Title VII retaliation case." (citation and internal quotation marks omitted) (alterations adopted)). The only other evidence Plaintiff cites in support of the causation element of her retaliation claim is an August 2015 email from city council member Barbara Bender to the Snellville city attorney inquiring about Plaintiff's eligibility to serve as the absentee ballot clerk in the upcoming election, given her pending EEOC Charge. It is undisputed that Bender subsequently voted to appoint Plaintiff to the absentee ballot clerk position, and that Plaintiff received the appointment and remained employed as city clerk for several months after Bender's inquiry to the city attorney. Given that fact, it would be unreasonable to infer from Bender's August 2015 inquiry that Plaintiff's termination was related to her EEOC charge.

Even assuming Plaintiff could establish a prima facie case of causation, she cannot establish "but-for" causation as required to overcome the City's legitimate explanation for her termination—namely, performance issues and doubt on the part of then-mayor Witts and the city council concerning Plaintiff's ability to loyally serve the incoming Witts administration. *See Tolar*, 997 F.3d at 1294 ("At the

30

stage of summary judgment proceedings in which the plaintiff must rebut the defendant's proffered nonretaliatory reason for its action . . . the plaintiff must meet the more demanding 'but for' test [to establish causation].").  The City's explanation for Plaintiff's termination meets its "exceedingly light" burden at the second stage of the *McDonnell Douglas* analysis to articulate a legitimate, nonretaliatory reason for its adverse action.  *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1312 (11th Cir. 2016) (citation and internal quotation marks omitted). *See also Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020) ("Under *McDonnell Douglas*'s terms . . . only the burden of production ever shifts to the defendant, never the burden of persuasion.").

Because the City has articulated a legitimate, nonretaliatory reason for its decision, the burden shifts to Plaintiff "to come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by [the City] were not the real reasons" for its action, and that the real reason was retaliation.  *Furcron*, 843 F.3d at 1313 (citation and internal quotation marks omitted).  "Conclusory allegations" of retaliation, "without more, are not sufficient to raise an inference of pretext."  *Id.* (citation and internal quotation marks omitted).  At this stage of the analysis, Plaintiff can only survive summary judgment by presenting "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth" of each legitimate explanation proffered by

31

the City. *Id.* (quotation marks omitted). As this Court explained in a recent en banc decision:

> We have repeatedly emphasized that provided . . . the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it. Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence. A reason is not pretext for retaliation unless it is shown *both* that the reason was false, *and* that retaliation was the real reason. And to repeat, in determining whether the plaintiff has met her burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her.

*Gogel*, 967 F.3d at 1136 (internal citations and quotation marks omitted) (alterations adopted).

In her appellate brief, Plaintiff cites three pieces of evidence to show pretext: (1) Council members Witts and Howard are members of a Facebook group that allegedly referred to Plaintiff and her husband as monkeys, (2) deposition testimony by Kautz that Witts had accused Kautz of racebaiting during council meetings, and (3) an alleged statement by Witts to the effect that he could not be racist because he had black employees. With respect to the Facebook incident, Plaintiff could not recall any specifics about the conversation, including whether the comment referred to her. Not only that, but although Plaintiff testified in her deposition that she had a copy of the Facebook post, she nevertheless failed to

32

submit it as evidence.  Under those circumstances, this alleged incident cannot establish pretext.  As for the other two pieces of evidence, even when considered in conjunction with the nebulous Facebook allegation, those comments do not establish "but-for" causation as is required for Plaintiff's retaliation claim to survive summary judgment at the pretext stage of the analysis.  *See id.* at 1135–36. Accordingly, Plaintiff's retaliation claim would fail at the pretext stage of the analysis, even if she could establish a prima facie case.

## CONCLUSION

For the reasons stated above, we affirm the district court's order granting summary judgment to the City on Plaintiff's Title VII race discrimination, racial harassment, and retaliation claims.

**AFFIRMED.**